## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HENRY MILTON LEWIS,

    Plaintiff,

    v.

PRINCE GEORGE'S COUNTY BOARD
OF EDUCATION,

    Defendant.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**CIVIL NO. JKB-21-2720**

### MEMORANDUM

Currently pending before the Court are: (1) a Motion for Summary Judgment filed by Plaintiff Henry Milton Lewis (ECF No. 102); (2) a Motion for Summary Judgment filed by Defendant Prince George's County Board of Education (the "Board") (ECF No. 103); and (3) a Motion to Strike filed by Lewis (ECF No. 105). For the reasons that follow, the Board's Motion will be granted, and Lewis's Motions will be denied.

### I.    Factual Background

Lewis was hired by Prince George's County in 2012. He was hired in the role of Project Manager II, a role he still occupies today. In 2016, Lewis applied for the Project Management Supervisor role, but was not selected. (*See* Board Ex. B7, ECF No. 103-5 at 121–27.) William Smith, a younger candidate, was selected. (*Id.*) The record reflects that Lewis was ranked fifth out of six applicants. (Lewis Ex. 42, ECF No. 102-40.)

On or around July 7, 2016, Lewis filed an internal complaint, known as an AP 4170 complaint, regarding his non-selection for the Project Management Supervisor role, alleging that he was discriminated against on the basis of his age. (Lewis Ex. A, ECF No. 102-49; Board Ex.

B7, ECF No. 103-5 at 121–27.)  On November 22, 2016, Lewis filed, on the same grounds, a Charge of Discrimination against the Board with the Maryland Commission on Civil Rights and the Equal Employment Opportunity Commission ("EEOC").  (Lewis Ex. B, ECF No. 102-50.)

Amana Simmons, the Prince George's County Public Schools Equal Employment Opportunity Administrator, investigated the July 7, 2016 internal complaint and concluded in a February 2017 report that there was no age discrimination.  (Board Ex. A1, ECF No. 103-4 at 26–30 ("[T]he investigation was unable to substantiate [Lewis's] allegation that he was not offered the Project Management Supervisor position as a result of his age.  Objectively, there were other candidates whose interview performance exceeded that of [Lewis].  Indeed, all but one interview candidate scored higher than [Lewis].").)  However, Simmons did identify a "candidate screening deficiency" because Smith did not meet the minimum education requirements for the Project Management Supervisor position.  (*Id.*)  The position, as advertised, required a "professional degree . . . in architecture or engineering"; Smith, by contrast, had a Bachelor of Science in Business Administration.  (*Id.*)  Simmons recommended that the position be reposted.  (*Id.*)

The Project Management Supervisor role was thereafter reposted, this time with different educational requirements.  Instead of requiring a "[p]rofessional degree from an accredited college or university in architecture or engineering," (Board Ex. G1, ECF No. 103-10 at 58–61), the educational requirements for the reposted position were: "Professional degree from an accredited college or university with some coursework in Architecture, Engineering, Construction Management or a related field; or any equivalent combination of experience, education and training which provides the required knowledge, skills, and abilities."  (Board Ex. G2, ECF No. 103-10 at 62–65.)

Lewis again applied for the position, as did Smith.  A document from October 26, 2017

2

reflects feedback from interviewers on four candidates, including Smith and Lewis. (Lewis Ex. 25, ECF No. 102-25.) For each candidate, the document reflects "Strengths" and "Areas of Development." (*Id.*) Lewis's strengths included his experience and education. (*Id.*) His areas of development included that he "[n]eeds to better understand conflict" and that "[n]o supervision or management experience was demonstrated." (*Id.*) Smith's strengths included that he "[h]as knowledge of our program and is acting in the role of supervisor" and that he "has a plan" and "understand[s] how to manage and develop PMs." (*Id.*) His weaknesses included that he should not use employee names in an interview and that he "need[s] to work on dispute resolution skills a little." (*Id.*) Smith was again selected for the position in early 2018. (Lewis Ex. 26, ECF No. 102-26.)

In 2017, Lewis applied for another position, Director of Capital Programs. (*See* Lewis Ex. K, ECF No. 102-58.) In or around October 2017, Shawn Matlock was selected for this position. (*Id.*) On March 5, 2018, Lewis filed another Charge of Discrimination against the Board with the Prince George's County Human Relations Commission and the EEOC, stating that he believed the Board engaged in age discrimination in selecting Matlock for the position. (Lewis Ex. E, ECF No. 102-53.) He explained that he "believe[d] that [the Board] failed to hire [him] because of [his] age (63)." (*Id.*) He also filed an AP 4170 complaint making similar allegations. (Lewis Ex. D, ECF No. 102-52.)

On April 4, 2018, Lewis and Smith had an email exchange regarding certain work-related projects. (Lewis Ex. 47, ECF No. 102-45 at 16–18.) Lewis argued with Smith regarding certain determinations Smith had made, and stated: "This is not about egos, I am trying to prevent us from having a protest from the contractor like what happened to you on your Tulip Grove project. I hold nothing against you due to your lack of education, experience or qualifications – compared

3

to mine." (*Id.*)

On April 25, 2018, Lewis emailed Matlock to "set the record straight" after their "incident yesterday." (*Id.* at 9.) Lewis described an event that occurred on April 24, 2018. (*Id.*) In the email, he explained that "there was an incident with [Matlock], involving Will Smith and [Lewis]." (*Id.*) He explained that, after a meeting, Lewis "directed a question to the meeting's coordinator, Sam Stefanelli, Director of Facilities" but that "Mr. Smith proceeded to answer [Lewis's] question for Mr. Stefanelli, which turned into a bit of back and forth between [Smith and Lewis]." (*Id.*) He further explained that he felt that "Mr. Smith was attempting to speak over [him] in an effort to embarrass [him] at the meeting" and described Matlock "proceed[ing] to shout 'Gentlemen, we will continue this back at the office.'" (*Id.*) He stated that he believed that Mr. Matlock's actions were in retaliation for his age discrimination complaint. (*Id.*) Lewis also noted that two other employees approached him, stating that Lewis was rude during the meeting. (*Id.*)

Matlock responded on April 26, 2018, expressing his view that there is "no retaliation against" Lewis, but that he believes that Lewis is "engaging in [his] own retaliatory campaign against this department." (Lewis Ex. 2, ECF No. 102-3.) Matlock raised examples of instances where, in his view, Lewis was disrespectful and disruptive. (*Id.* ("Before I get into the incidents of this week, I must point out that your conduct and attitude has been generally uncooperative, unprofessional and in many cases insubordinate. You have engaged in numerous micro-aggressions, like disputing straightforward instructions, not participating in team building activities, and questioning and/or casting dispersions on department initiatives.").) Matlock described his view of the April 24 event, explaining that Lewis had been disruptive and disrespectful, and noting that if Lewis had attended a prior mandatory meeting, he would have understood the purpose of the April 24 meeting. (*Id.*) Matlock stated that he is "aware that [Lewis]

4

has grievances, but [Matlock] believes [Lewis is] allowing those grievances to color every interaction [he has] with the people in this office" and that Matlock "sincerely want[s] the benefit of [Lewis's] talent and experience; however [Lewis] must change the way [he] conducts [him]self." (*Id.*)

Also on April 26, 2018, Lewis received a "Performance Correction Notice" from Matlock. It raised several issues: (1) Lewis's failure to attend mandated "FSDirect" training; (2) Lewis's failure to attend a mandatory "summer projects meeting"; and (3) Lewis's disrespectful communication with Smith, including refusing to carry out direct instructions from his supervisor, accusing his supervisor of fraud, and using "rude, argumentative, disparaging, hostile" language. (Lewis Ex. 3, ECF No. 102-4.) The Notice also provided, with respect to the training, that "[f]ailure to complete [the] training will require further progressive disciplinary actions." (*Id.*) With respect to his failure to attend the summer projects meeting, the letter provided that "[t]his is your first warning on this matter" and that "[f]ailure to attend future meetings will result in additional progressive disciplinary actions." (*Id.*) With respect to his disrespectful communication, the letter provided that "this is your first warning on this matter" and that "[f]ailure to comply with my request for your change in behavior will result in additional progressive disciplinary actions up to and including dismissal." (*Id.*)

Around July 23, 2018, Lewis filed an AP 4170 complaint regarding the failure to promote him to Constructive Officer/Deputy Director. (Lewis Ex. C, ECF No. 102-51; Board Ex. D1, ECF No. 103-7 at 19.) He alleged that he was subjected to age discrimination because he was "denied the equal opportunity to apply for the position[.]" (Board Ex. D1, ECF No. 103-7 at 19.)

On August 20, 2018, Lewis filed an amended Charge of Discrimination against the Board with the Prince George's County Human Relations Commission and the EEOC. (Lewis Exs. H,

5

I, ECF No. 102-56.) It provides that he was retaliated against on April 26, 2018 when he received the Performance Correction Notice from Matlock. (*Id.* ("The Performance Correction was done as a result of filing a discrimination complaint with the Respondent of why I was denied a promotion as Director of Capital Programs.").) It also provides that he was discriminated against on the basis of his age when the Board "a younger person in her thirties [] to be the Construction Officer/Deputy whose qualifications are questionable" and that he was "more qualified." (*Id.*)

A Corrective Action Document dated November 13, 2019 provides that "on November 6th, Mr. Henry Lewis engaged in conduct that was both unprofessional and offensive in our workplace environment" and that, during a meeting at which the relocation of project managers was discussed, Lewis "began raising his voice in an aggressive manner and made the statement that 'Senior Management was treating them like [racial epithet]!', then followed with 'I don't care you can write me up.'" (Lewis Ex. 6, ECF No. 102-7.) That reprimand referenced two prior reprimands: the one on April 26, 2018 described above and another on June 28, 2019.[1] (*Id.*) It also provided that the failure to rectify the behavior or the introduction of new concerns "could result in further corrective action up to and including termination of employment." (*Id.*)

On the Corrective Action Document form, there are three options: Verbal Counseling, Professional Counseling, and Reprimand. (*Id.*) "Reprimand" is selected. (*Id.*) The form notes that the first two are not disciplinary actions. (*Id.*) In March 2020, the "Reprimand" was downgraded to a "Letter of Professional Counsel" and was removed from Lewis's personnel file

---

[1] In a June 28, 2019 email, Smith stated: "This email is in response to this afternoon's conversation where you refused to meet with me to perform your evaluation in front of Joe, Hiwot, and Cedric. Specifically, your response to me after asking 'if I could have 2 minutes of your time to complete your evaluation before you left for the weekend' was 'I don't feel like having this conversation with you right now' and 'You waited until the end of the day to have this and I'm not in the mood.'" (Lewis Ex. 5, ECF No. 102-6.) Smith explained that evaluations must be completed by June 30, and because Lewis completed his self-assessment that day (which was six days past the deadline), Smith could not provide Lewis with his evaluation until June 28 (which was a Friday). (*Id.*)

6

because he did not have union representation at the meeting at which he was given the letter. (Lewis Ex. 10, ECF No. 102-11.)

Around December 2, 2019, Lewis filed another internal complaint alleging that Matlock and Smith entered false information into his personnel file, that Matlock yelled at him, and that he had been denied jobs due to age discrimination. (Board Ex. D1 at 19–20.)

On October 22, 2021, Lewis initiated this suit.

On November 8, 2021, Lewis sent an email stating: "There is nothing like seeing a project in person to see the progress, or lack of progress, and how it relates to the reality of a written schedule." (Lewis Ex. O, ECF No. 102-61.) He therefore requested an "all hands" "walk through of" a facility. (*Id.*) He stated: "In addition to Capital Programs, I would invite the school staff and their invitees." (*Id.*) It is unclear from the exhibit who received this email, but Smith responded stating that he had removed the school staff from the email chain. (*Id.*) In essence, Smith's email noted that Lewis had not raised his concerns regarding the facility through the appropriate chain. (*Id.*) Lewis then responded, refuting various points of Smith's email, including stating, for example, that "[t]he reason I 'skipped' you is because of your previous lack of action" and that "I, like other PMs, have no confidence in your leadership and we have no support from you when we have problems." (*Id.*) Lewis also stated that he was "appalled" by Smith's email and that "[t]he reason I bypassed you and Shawn [presumably Matlock] is because I have no confidence in your education, training, or years of experience compared to mine. Yes, you are my supervisor but that does not substitute for your lack of experience and judgement with this project." (*Id.*)

On November 17, 2021, Lewis received another Corrective Action Document. (Lewis Ex. 13, ECF No. 102-14.) As with the previous form, there are three options: Verbal Counseling, Professional Counseling, and Reprimand. (*Id.*) "Professional Counseling"—which was non-

disciplinary—was selected. (*Id.*) It asserted that Lewis had engaged in misconduct in office and insubordination by failing to adhere to deadlines, by communicating inappropriately with stakeholders, and by communicating unprofessionally with his supervisor. (*Id.*) It further provided that the failure to rectify the behavior or the introduction of new concerns "could result in further corrective action up to and including termination of employment." (*Id.*)

Around November 23, 2021, Lewis filed a Discrimination or Harassment Incident Report. (Lewis Ex. L, ECF No. 102-59.) He explained that he was being retaliated against, bullied, intimidated, and harassed by Smith, Matlock, and others. (*Id.*)

On December 6, 2021, Lewis filed a related suit in this Court.

As is relevant for purposes of the pending Motion, the Court previously dismissed Lewis's age discrimination claims, and his only remaining claims relate to retaliation.

## II.     Summary Judgment Motions

For the reasons discussed below, the Board's sovereign immunity argument fails. However, the Court finds that summary judgment should be granted in the Board's favor.

### A. Legal Standard

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment on a "claim or defense—or the part of [any] claim or defense—on which summary judgment is sought," provided the party shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the Court will award summary judgment, unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ.

8

P. 56(e). If sufficient evidence exists for a reasonable factfinder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. Rule 56 requires parties to support summary judgment arguments with sufficient citations to the record. Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by [either] . . . citing to particular parts of materials in the record, . . . [or] showing that the materials cited do not establish the absence . . . of a genuine dispute[.]").

"Where no genuine issue of material fact exists, [the Fourth] Circuit has noted the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (citation omitted).

### B. Sovereign Immunity

The Board argues that it is entitled to sovereign immunity because Maryland law permits it to raise such a defense in the face of a claim for over $400,000, and that Lewis seeks over $400,000. (ECF No. 103-1 at 16 (citing Md. Code, Cts. & Jud. Proc. § 5-518(c).).

"The States' immunity also extends to 'state agents and state instrumentalities.'" *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 248 (4th Cir. 2012). The Board is such a state agency or instrumentality. *See id.* at 248 n.5. However, "[t]he Eleventh Amendment bar to suit is not absolute." *Id.* (citation and quotation marks omitted). There exist exceptions, including—as relevant here—a state's waiver of its immunity. *Id.*

There is no dispute by the parties that Maryland has waived its sovereign immunity with respect to ADEA claims. Indeed, Maryland law provides that "a county board of education may

not raise the defense of sovereign immunity to any claim of $400,000 or less," Md. Code, Cts. & Jud. Proc. § 5-518(c), and Maryland courts and courts in this district have construed this provision as a "limited waiver of immunity for" claims brought against boards of education. *See, e.g.*, *Peters v. Balt. City Bd. of Sch. Comm'rs*, Civ. No. WMN-13-3114, 2015 WL 5157464, at \*2 (D. Md. Sept. 1, 2015). This includes ADEA claims. *See Bd. of Educ. of Balt. Cnty. v. Zimmer-Rubert*, 973 A.2d 233, 242 (Md. 2009).

The issue here is therefore narrow: whether Lewis's ADEA claim against the Board is barred by sovereign immunity in its entirety because he seeks over $400,000 in damages. The Court concludes that it is not.

The language of the statute itself provides, as is relevant here, that "[a] county board of education . . . may raise the defense of sovereign immunity to: (1) Any *amount* claimed above the limit of its insurance policy; or (2) . . . If self-insured or a member of a pool . . . any *amount* above $400,000." Md. Code Ann., Cts. & Jud. Proc. § 5-518(b) (emphasis added). The statute goes on to state that "a county board of education may not raise the defense of sovereign immunity to any claim of $400,000 or less." *Id.* § 5-518(c). Read together, the Court concludes that, while the Board is entitled to raise a sovereign immunity defense as a cap on its liability, it may not use § 5-518 to bar Lewis's claim in its entirety. This approach is in line with that taken by this Court in prior cases. *See, e.g.*, *Cepada v. Bd. of Educ. of Baltimore Cnty.*, 814 F. Supp. 2d 500, 509 (D. Md. 2011); *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, Civ. No. CBD-08-3327, 2010 WL 481333, at \*3 (D. Md. Feb. 5, 2010), *aff'd*, 666 F.3d 244 (4th Cir. 2012).

Further, the extent of the cap in this case is not clear, and the parties have not briefed the issue. As already noted, the law provides that a board of education can raise a sovereign immunity defense to "[a]ny amount claimed above the limit of its insurance policy" or, "[i]f self-insured or

10

a member of a pool[,] . . . any amount above $400,000." Md. Code Ann., Cts. & Jud. Proc. § 5-518(b). No party has pointed to any evidence regarding the Board's insurance policy, whether it is self-insured, or whether it is a member of a pool. A plain reading of the statute suggests that the Board's damages would be limited to $400,000 only if its insurance policy was so limited, or if it was self-insured or a member of a pool.[2] If the Board's insurance policy is greater than $400,000, damages would be capped at that greater amount. *See, e.g., Kerrigan v. Bd. of Educ. of Carroll Cnty.*, Civ. No. WDQ-14-3153, 2015 WL 4591053, at *7 (D. Md. July 28, 2015) ("[I]mportantly, the Board has not provided any evidence demonstrating whether it is privately insured, self-insured, or part of a pool. Thus, on the current record, the Court is unable to determine whether compensatory damages should be capped[.]").

Accordingly, the Court will deny the Board's Motion with respect to its sovereign immunity argument.

## C. Retaliation Claim

Lewis complains of five allegedly retaliatory actions: his non-selection for the Project Management Supervisor position the second time it was posted; the April 26, 2018 Performance Corrective Notice and email; the November 15, 2019 Corrective Action Document; the November 2021 Corrective Action Document; and the Board's failure to produce investigative reports and investigate one of Lewis's complaints associated with his November 2019 reprimand.[3]

---

[2] Per Maryland law, county boards of education are required to have insurance coverage of not less than "$400,000 for each occurrence." Md. Code Ann., Educ. § 4-105. However, the Court is not aware of any law that provides an upper limit to the amount of insurance a county board of education can obtain.

[3] The parties disagree about whether Lewis properly exhausted his administrative remedies with respect to the non-selection for the Project Management Supervisor position, the November 2019 Corrective Action Document, and the failure to produce investigative reports and to investigate. An earlier decision, decided before the case was transferred to the undersigned, concluded that Lewis could not amend his complaint to add these actions because they were unexhausted. (*See* ECF No. 38 at 16–18.) The Court finds that these three claims were likely properly exhausted, and will therefore address them in deciding the pending Motions.

A plaintiff may make out an ADEA retaliation claim using either direct or circumstantial evidence. When evidence is circumstantial, as here, courts use the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

First, a plaintiff must "establish a prima facie case by showing: (i) that [he] engaged in protected activity, (ii) that [his] employer took adverse action against [him], and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (citations, internal quotation marks, and alterations omitted).

For purposes of a retaliation claim, a materially adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations and internal quotation marks omitted). "This standard for establishing an adverse employment action under [an] antiretaliation provision is more expansive than the standard for demonstrating a tangible employment action under the statute's antidiscrimination provisions." *Ray v. Int'l Paper Co.*, 909 F.3d 661, 670 (4th Cir. 2018). Further, "although an adverse action need not affect the terms and conditions of employment, there must be some direct or indirect impact on an individual's employment as

---

First, "so long as a plaintiff's claims in [his] judicial complaint are reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation, [he] may advance such claims in [his] subsequent civil suit." *Sydnor v. Fairfax Cnty., Va.*, 681 F.3d 591, 594 (4th Cir. 2012). The Fourth Circuit has found exhaustion "where both the administrative complaint and formal litigation concerned discrimination in promotions but involved different aspects of the promotional system, and where both the EEOC charge and the complaint included claims of retaliation by the same actor, but involved different retaliatory conduct." *Id.* (citations and internal quotation marks omitted). Here, Lewis complained of retaliation in one of his EEOC complaints, and an investigation of the three instances could be expected to follow from a reasonable investigation.

Second, "a plaintiff may raise for the first time in federal court the claim that her employer retaliated against her for filing with the EEOC." *Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 416 (4th Cir. 2014). Here, Lewis claims that he was retaliated against for engaging in protected activity, including filing EEOC charges of discrimination.

Accordingly, the Court will consider Lewis's arguments with respect to all five instances of alleged retaliation.

opposed to harms immaterially related to it." *Id.* (citation and internal quotation marks omitted).[4] "[D]islike of or disagreement with an employer's decisions does not invariably make those decisions ones that adversely affected some aspect of employment." *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015). With respect to establishing a causal connection, "[a] plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes." *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (citation and internal quotation marks omitted). "A plaintiff may establish the existence of facts that suggest that the adverse action occurred because of the protected activity." *Id.* (citation, internal quotation marks, and alterations omitted). Or, "[a] plaintiff may also show that the adverse act bears sufficient temporal proximity to the protected activity." *Id.* (citation, internal quotation marks, and alterations omitted).

Second, "[t]he burden then shifts to the [employer] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster*, 787 F.3d at 250 (citation omitted).

Third, "[i]f the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination." *Id.* (citations, internal quotation marks, and alterations omitted). At this final stage, "the plaintiff must put forth evidence that, if believed, could convince a finder of fact that the employer's purported reasons were pretextual, and that the actual basis for its employment decision was unlawful." *Groth v. Nakasone*, Civ. No.

---

[4] The Board cites an incorrect standard for assessing whether an action is adverse. It explains that "Lewis cannot show that the corrective actions were materially adverse in that they negatively impacted the terms and conditions of his employment." (ECF No. 108 at 7.) This is not the standard in a retaliation case. It is well established that the standard in a retaliation case is more lenient, and that an action "need not affect the terms and conditions of employment" to be considered adverse. *Ray*, 909 F.3d at 670 (citation and internal quotation marks omitted).

JKB-16-2569, 2019 WL 3254602, at *6 (D. Md. July 18, 2019), *aff'd*, 788 F. App'x 913 (4th Cir. 2019) (citations and internal quotation marks omitted).

"A plaintiff can prove a violation of the ADEA through direct or circumstantial evidence" but "[r]egardless of the method of proof, a plaintiff retains the ultimate burden to prove by a preponderance of the evidence that age or retaliation was the 'but-for' cause of the challenged employer decision." *Cole v. Fam. Dollar Stores of Maryland, Inc.*, 811 F. App'x 168, 172 (4th Cir. 2020) (citation omitted).

The Court examines each of the alleged retaliatory actions in turn.

### 1. Second Non-Selection for Project Management Supervisor

Lewis argues that Smith's selection for the Project Management Supervisor position the second time it was posted was retaliatory. He explains that it was retaliatory because he "had filed protected activities before [his] non-promotion [] from July 7, 2016, up to the time that Plaintiff was retaliated [against] by non-promotion." (ECF No. 102-1 at 24.) The Court will presume, for purposes of the pending Motions, that Lewis has established a prima facie case (although the Court doubts that he has established the final element: causation).

The Board has met its burden of providing a non-retaliatory reason for Lewis's non-selection in favor of Smith: Smith was a stronger candidate for the Project Management Supervisor position. Lewis has not provided sufficient evidence to demonstrate that this proffered reason was pretext for unlawful retaliation. Lewis argues that "Plaintiff's superior qualifications, Smith's lack of education, the re-writing of the 2nd advertisement, and Smith remaining in the position after he was found to be unqualified proves Defendant's pretext and retaliation." (ECF No. 102-1 at 11.)[5]

---

[5] Lewis also argues that an email from Fossett to Human Resources in which Fossett states that the general counsel has recommended that they move forward with the readvertising of the position, shows pretext. (ECF No. 102-1 at 24.) It is not clear how such an email tends to show pretext, and no reasonable juror could so find.

As an initial matter, the undisputed facts reflect that Lewis engaged in protected activity by filing an internal complaint in July 2016 and an EEOC Charge of Discrimination in November 2016, and was denied the job for the second time around February 2018. This length of time—of over a year—is simply too great to provide evidence of causation in the absence of other evidence tending to show causation. *See Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) ("[A] lapse of two months between the protected activity and the adverse action is sufficiently long so as to weaken significantly the inference of causation." (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)).

Further, there is no evidence in the record from which a reasonable juror could conclude that the Board's emphasis on Smith's leadership skills over Lewis's educational background was pretext for unlawful retaliation. It is true that "[c]ourts have repeatedly found that an employer's decision to emphasize qualities not pertinent to the job in selecting a candidate is probative of pretext." *Ham v. Washington Suburban Sanitary Comm'n*, 158 F. App'x 457, 466 (4th Cir. 2005); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006) ("[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext."). However, nothing in the record suggests that the Board emphasized qualities not pertinent to the Project Management Supervisor position in selecting Smith. It is undisputed that both the first and second job listings for that position—a supervisory position—indicated that various management and supervisory skills were necessary to the job, such as: "[s]upervis[ing] project managers and project management staff by assigning tasks and supporting/monitoring compliance with project parameters"; "[c]onferring with consultants, design team and construction team to provide guidance and direction"; "[g]ood communication skills"; and "[a]bility to lead a team of professionals." (Board Ex. G1, ECF No. 103-10 at 58–61; Board Ex. G2, ECF No. 103-10 at 62–65.) The second time that Lewis applied

15

for the position, the interviewers found that his strengths included his experience and education, but they also concluded that he lacked supervision and management experience, and that his conflict resolution skills were poor. (Lewis Ex. 25, ECF No. 102-25.) By contrast, the interview notes reflect that Smith had relevant experience, had knowledge of the project management program, and understood how to manage and develop project managers. (*Id.*)

It is Lewis's view that the Board should have valued his experience and education over Smith's leadership and supervision skills in making the hiring decision, but "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996) (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)); *see also King*, 328 F.3d at 149 ("[Plaintiff's] own testimony, of course, cannot establish a genuine issue as to whether [Plaintiff] was meeting appellee's expectations."). Further, even if Lewis is correct that the Board should have valued his experience over Smith's skills, "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [employment decision]." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation and quotation omitted).

The facts reflect that the Board found Smith to be the appropriate person for the Project Management Supervisor position both times he and Lewis applied for it. As described above, the facts reflect that Lewis applied for the Project Management Supervisor position in 2016, was ranked fifth out of six applicants, and was not selected for the position. Smith was ranked as the number one candidate and was offered the position, prior to any protected activity by Lewis. Lewis then complained that this selection was discriminatory. While his complaint of discrimination was not substantiated, the investigator found that Smith's educational requirements did not match those of job posting, and she suggested that the position be reposted. The job was reposted, with different

16

educational requirements. The undisputed evidence in the record is that it was common to change requirements in a job description. (Board Ex. G (Fossett Deposition), ECF No. 103-10 at 9–10.) Smith was again selected for the position in early 2018. Therefore, the undisputed facts reflect that the Board persisted in its view that Smith was the stronger candidate for the Project Management Supervisor position—both before and after Lewis engaged in protected activity.  In short, the Board found Smith to be a stronger candidate both times that he applied for the position. *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

In viewing the facts in the light most favorable to Lewis, as the Court must, Smith's second selection for the position appears to have been somewhat orchestrated, and perhaps even unfair: Smith was selected for the position, it was found that he did not meet the educational requirements, the job posting was edited in a way that appears tailored to Smith, and Smith was again selected. However, even assuming that Smith was preselected for the position, that fact is simply not evidence of pretext. *Blue v. U.S. Dep't of Army*, 914 F.2d 525, 541 (4th Cir. 1990) (preselection by an employer "might demonstrate that [the plaintiff], as well as all the other applicants for the job, may have been unfairly treated, it does not by itself prove" impermissible discrimination); *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005) ("The argument that a supervisor may have preselected an employee for a promotion is not sufficient evidence for jurors reasonably to conclude that the defendants' explanation for hiring [that employee] was pretext. If one employee was unfairly preselected for the position, the preselection would work to the detriment of all applicants for the job[.]" (citations and internal quotation marks omitted).)

17

In short, Lewis simply does not carry his ultimate burden of showing that retaliation was a but-for cause of his non-selection for this position.

### 2. Corrective Actions

#### a. April 2018 Performance Corrective Notice and Email

As noted above, in early March 2018, Lewis filed an internal complaint and an EEOC Charge of Discrimination regarding his non-selection for the position of Director of Capital Programs, alleging that he was being discriminated against based on his age. On April 4, 2018, Lewis had a somewhat heated exchange with Smith. (*See* Lewis Ex. 47, ECF No. 102-45 at 16–18.) In that email—even viewing it in the light most favorable to Lewis—Lewis is argumentative and states: "I hold nothing against you due to your lack of education, experience, or qualifications – compared to mine." (*Id.*) On April 25, 2018, Lewis emailed Matlock to "set the record straight" after an "incident" that occurred on April 24, 2018 in which Lewis expressed that he believed that Smith was being disrespectful. (*Id.* at 9.) On April 26, 2018, Matlock responded to Lewis's email, raising examples of instances where, in his view, Lewis was disrespectful and disruptive. (*Id.*) Lewis also received a "Performance Correction Notice" from Matlock, which raised several issues: (1) Lewis's failure to attend mandated "FSDirect" training on April 5, 2018; (2) Lewis's failure to attend a mandatory "summer projects meeting" on April 10, 2018; and (3) Lewis's disrespectful communication with Smith between March 26, 2018 and April 4, 2018, including refusing to carry out direct instructions from his supervisor, accusing his supervisor of fraud, and using "rude, argumentative, disparaging, hostile" language. (Lewis Ex. 3, ECF No. 102-4.)

Lewis argues that the April 26, 2018 Performance Corrective Notice and email were retaliatory. He also argues that "[t]he proximity of the Plaintiff's retaliation complaint and the

18

discipline is proof of retaliation." (ECF No. 102-1 at 23.)[6]

Lewis fails to establish the first and third elements of a prima facie case of retaliation. First, he fails to establish that the Performance Corrective Notice and email are adverse employment actions. As the Fourth Circuit has explained, even under the more generous standard that applies to retaliation cases, "reprimands and poor performance evaluations occur with some frequency in the workplace" and "[w]hile the analysis of them is necessarily dependent on the circumstances, they are much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent." *Adams*, 789 F.3d at 431 (citation omitted). Further, "[a]n employee is not insulated from discipline simply because he engaged in protected activity." *Barnes v. Charles Cnty. Pub. Sch.*, 747 F. App'x 115, 119 (4th Cir. 2018).

There are circumstances under which a letter of reprimand could rise to the level of an adverse employment action for purposes of a retaliation claim. However, the Court concludes that there is no adverse action here, where the undisputed evidence reflects that the April 26, 2018 Performance Corrective Action is not in Lewis's employment file,[7] where there is no evidence that it had any impact on his ability to apply for other jobs or any other impact on his employment (*see* Board Ex. J, ECF No. 103-13), and where there is no evidence that there was otherwise a "direct or indirect impact on" his employment, *Adams*, 789 F.3d at 431. *See Israelitt v. Enter. Servs.*

---

[6] Lewis also points to language in the letter itself, arguing that the letter explained that he was to make "no further outbursts, accusations, or complaints…" (ECF No. 102-1 at 9.) To the extent that Lewis attempts to argue that this letter provides direct evidence of retaliation because it prohibits him from making "accusations" or "complaints," he is incorrect. Lewis provides an incomplete quotation of the letter: the letter—referencing Lewis's purported disrespectful tone at a meeting on April 24, 2018—states that "You are to make no further outburst, accusations, complaints or disparaging remarks *at future meetings*." (Lewis Ex. 3, ECF No. 102-4 (emphasis added).)

[7] Lewis speculates that there is a "secret" employment file on him. There is no evidence in the record of such a file other than Lewis's speculation. Rather, the evidence in the record reflects that "[t]here are currently no corrective actions contained in Mr. Lewis's personnel file." (Board Ex. J, ECF No. 103-13.)

*LLC*, 78 F.4th 647, 655 (4th Cir. 2023), cert. denied, 144 S. Ct. 1392 (2024) ("[R]etaliatory adverse actions must cause significant harm to be actionable."); *see also El Mahdy v. Morgan State Univ.*, Civ. No. SAG-20-2715, 2023 WL 6308033, at \*9 (D. Md. Sept. 28, 2023) (concluding that "a letter of reprimand that called Plaintiff 'non-collegial,' but did not become part of her employment file," was not an adverse action in the context of a retaliation claim).

Second, even assuming that Lewis established an adverse employment action, he fails to establish causation. Although the temporal proximity between his March 2018 complaints and the April 25, 2018 email and Performance Corrective Notice is somewhat close, the record reflects intervening facts were the reason for the Notice. Indeed, the Corrective Action Notice references three events that all occurred after his protected activity: his failure to attend training on April 5, 2018, his failure to attend a meeting on April 10, 2018, and disrespectful communication with his supervisor between March 26, 2018 and April 4, 2018. This breaks the causal chain between his protected activity and the allegedly retaliatory event. *See Mayes v. Graphic Packaging Int'l, Inc.*, Civ. No. 10-410-RJC-DSC, 2011 WL 5119448, at \*7 (W.D.N.C. Oct. 28, 2011), *aff'd sub nom.*, *Mayes v. Graphic Packaging Int'l*, 468 F. App'x 316 (4th Cir. 2012) ("The reprimands were in direct response to Plaintiff's failure to meet production standards and running of defective product. Such intervening incidents of misconduct break Plaintiff's alleged chain of causation."); *Dune v. G4s Regulated Sec. Sols., Inc.*, Civ. No. JFA-BM-13-1676, 2014 WL 7920436, at \*14 (D.S.C. Dec. 15, 2014) ("[A]n employee's violation of company policy is an intervening act that can break a causal connection between the protected activity and an adverse employment action.").

Moreover, even if Lewis had established a prima facie case, which he has not, the Board has advanced a non-retaliatory reason for the Performance Corrective Notice and email: the reasons provided in the Notice. Lewis has not advanced evidence from which a reasonable juror

20

could conclude that these reasons are pretextual or that his protected activity was a but-for cause of the purportedly adverse actions.

The undisputed facts reflect that these reprimands were in response to behavior by Lewis that his supervisors found problematic. Viewed in the light most favorable to Lewis, even if the exact contours of what occurred remain disputed between the parties, it is clear that his supervisors found his behavior to be problematic and requiring attention. For instance, the undisputed record evidence reflects that Lewis sent an email to his supervisor stating that "I hold nothing against you due to your lack of education, experience or qualifications – compared to mine." (Lewis Ex. 47, ECF No. 102-45 at 16–18.) Further, Lewis himself conceded during his deposition that the FSDirect training was a requirement. (Board Ex. B, 103-5 at 21 (Q: "Was it your understanding that this training was mandatory?" A: "I don't know. I don't know if it was truly my understanding it was mandatory. I know I had to take it.").) In short, while there may be some dispute regarding whether certain actions amounted to insubordination or something more benign, such as a miscommunication, "this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation and internal quotation marks omitted). As explained above, these intervening acts break the causal chain. *See Cole*, 811 F. App'x at 174 ("Between her complaint to human resources and her termination, an intervening event occurred: [plaintiff] incurred two consecutive no call/no show absences, which [defendant] says were the basis for her termination.").

Lewis argues that no other employees received Performance Corrective Notices for not attending the FSDirect training, but rather received Notices to Complete Training. (ECF No. 102-1 at 8.) While this may be true, a review of the Notices to Complete Training in the record received by three other employees reflects that the only issue in those Notices was the failure of each

employee to complete training. (Lewis Ex. 4, ECF No. 102-5.)  Further, unlike Lewis, each of the

other Notices reflects that the absences had been excused.  (*Id.*)  Lewis's Performance Corrective

Notice raised his failure to attend the training, but also his purported failure to attend a mandatory

"summer projects meeting" and disrespectful communication with Smith, including refusing to

carry out direct instructions from his supervisor, accusing his supervisor of fraud, and using "rude,

argumentative, disparaging, hostile" language. (Lewis Ex. 3, ECF No. 102-4.)  Therefore, that the

other employees received Notices to Complete Training rather than Performance Corrective

Notices is not probative of retaliation.  *See Cole*, 811 F. App'x at 173 ("Comparator evidence is

useful in assessing pretext only when the comparator employees 'were similarly situated to the

plaintiff (but for the protected characteristic).'" (quoting *Laing v. Fed. Exp. Corp.*, 703 F.3d 713,

719 (4th Cir. 2013).)

      Therefore, the Court finds that Lewis has failed to show that the April 26, 2018

communications were retaliatory.

### b.  November 13, 2019 Corrective Action Document

      Lewis also argues that his November 13, 2019 Corrective Action Document was

retaliatory.  As explained above, the record reflects that Lewis made numerous complaints of

discrimination.  For instance, in July 2018 he filed an internal complaint regarding the failure to

promote him to Constructive Officer/Deputy Director. (Lewis Ex. C, ECF No. 102-51; Board Ex.

D1, ECF No. 103-7 at 19.)   In August 2018, Lewis filed an amended Charge of Discrimination

with the EEOC regarding the April 26, 2018 Performance Corrective Notice and the failure to hire

him for the Officer/Deputy Director position. (Lewis Exs. H, I, ECF No. 102-56.)  Lewis received

a November 13, 2019 Corrective Action Document that provided that, during a meeting on

November 6, 2019, Lewis "engaged in conduct that was both unprofessional and offensive" and

22

that he "rais[ed] his voice" and used a racial epithet. (Lewis Ex. 6, ECF No. 102-7.) The Corrective Action Document is denoted as a "Reprimand" but was later removed from his file and downgraded to a "Letter of Professional Counsel." (Lewis Ex. 10, ECF No. 102-11.)

Lewis denies that he used the racial epithet and argues that he was not provided with union representation with respect to this Reprimand. (ECF No. 102-1 at 9–10.) Lewis argues that "[t]he proximity of the Plaintiff's prior complaints, improper investigation, and the discipline is proof of retaliation." (*Id.* at 23.)

Lewis fails to establish a prima facie case of discrimination. As an initial matter, for the same reasons described above with respect to the April 2018 communications, the November 13, 2019 Corrective Action Document is not an adverse employment action. More critically, Lewis has failed to establish a causal connection between the Corrective Action Document and any protected activity. He engaged in protected activity in July and August 2018, and received the Corrective Action Notice over a year later, in November 2019. This is insufficient to establish causality. *See Breeden*, 532 U.S. at 273 ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close[.]"); *Lewis v. Gibson*, 621 F. App'x 163, 165–66 (4th Cir. 2015) ("[T]he temporal proximity between his protected activity and termination is, without more, insufficient to create a genuine issue of material fact.").

The Board has set forth a non-retaliatory reason for the Corrective Action Document: that Lewis was unprofessional and offensive in a meeting. In short, Lewis simply does not set forth sufficient evidence from which a juror could conclude that unlawful retaliation was a but-for cause of the discipline he received. Although Lewis disputes that he used a racial epithet during the

23

meeting, there is no dispute that some argument occurred during the meeting. Further, there is no evidence that Matlock—who had not been at the meeting but who issued the Corrective Action Document—did not sincerely believe that Lewis had acted unprofessionally during the meeting. (*See* Board Ex. H, ECF No. 103-11 at 51 (Matlock testifying that he was not at the meeting, but that multiple people reported to him what had happened and that he believed that he "needed to take immediate action" because Lewis's reported actions were "unprofessional").); *See Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 177 (4th Cir. 2023) ("[Plaintiff] has not shown that [the supervisor] did not honestly believe the reports of [plaintiff's] threatening comments. While [plaintiff] denies making any threats, three different sources indicated that she did . . . . Rather than refuting [the supervisor's] sincere belief, the record supports the contention that he found the threats credible.").

### c.  November 2021 Corrective Action Document

Lewis argues that his November 2021 Corrective Action Notice was retaliatory. As explained above, Lewis initiated this suit on October 22, 2021. In a November 2021 email exchange, Lewis and Smith disagreed regarding a project, with Smith expressing to Lewis that Lewis had not raised his concerns through the appropriate chain of command. (Lewis Ex. O, ECF No. 102-61.) Lewis's response—even considered in the light most favorable to Lewis—was argumentative, and he said things such as: "[t]he reason I 'skipped' you is because of your previous lack of action"; "I, like other PMs, have no confidence in your leadership and we have no support from you when we have problems"; and "[t]he reason I bypassed you and Shawn [presumably Matlock] is because I have no confidence in your education, training, or years of experience compared to mine. Yes, you are my supervisor but that does not substitute for your lack of experience and judgement with this project." (*Id.*) On November 17, 2021, Lewis Received a

Corrective Action Document. (Lewis Ex. 13, ECF No. 102-14.) It asserted that Lewis had engaged in misconduct in office and insubordination by failing to adhere to deadlines, by communicating inappropriately with stakeholders, and by communicating unprofessionally with his supervisor. (*Id.*)

Lewis argues that the document "contained minor violations or incorrect interpretation of Plaintiff's actions." (ECF No. 102-1 at 10.) He also argues that "[t]he proximity of [his] prior complaints, the filing of the lawsuit, and the discipline is proof of retaliation." (*Id.* at 24.)

Lewis's arguments are deficient for the same reason that they were deficient for the other two corrective actions. He fails to establish that the Performance Corrective Action is an adverse action for the same reasons described above. Further, this Corrective Action Document specifically notes that it is non-disciplinary "Professional Counseling." (*See* Lewis Ex. 13, ECF No. 102-14.) Lewis also fails to establish a causal connection between his filing of the instant suit and his receipt of the Performance Corrective Action. While the temporal proximity of his filing suit is short, intervening acts (i.e., his early November communications with his supervisor) severed the causal chain, similar to the instances discussed above.

### d. Corrective Actions as a Whole

Lewis argues that, even if each reprimand considered individually does not rise to the level of a materially adverse action, they do rise to such level as a whole. As an initial matter, this is not a situation where Lewis was subjected to frequent negative feedback from his supervisors. Here, he alleges that he received a corrective action in April 2018, another a year and a half later in November 2019, and another two years after that, in November 2021. The Court finds that these three actions, even considered as a whole, do not rise to the level of an adverse action for purposes

of a retaliation claim.

Further, even if the Court were to find that the three corrective actions did rise to the level of an adverse employment action, Lewis fails to establish that any of these reprimands were causally connected to his protected activity, as discussed above. *See Barnes*, 747 F. App'x at 119 ("While [plaintiff] contends that [defendant] engaged in a pattern of retaliatory conduct, [plaintiff] failed to introduce any evidence that [defendant] took her actions because of his protected activity rather than genuine concerns about his work performance and poor attitude.").

### 3.  Board's Failure to Produce Investigative Reports and to Investigate

Lewis alleges that the Board failed to file written investigative reports in violation of internal policy with respect to certain of his 4170 complaints and failed to properly investigate certain complaints. (ECF No. 102-1 at 17.)

Lewis again fails to establish a prima facie case of retaliation. First, he fails to establish that any failure to investigate or to produce investigative reports is an adverse employment action. *See Broadway v. Univ. of Md., Glob. Campus*, Civ. No. GLS-21-3226, 2023 WL 4421406, at *8 (D. Md. July 7, 2023) ("[V]arious courts have found that an employer's failure to investigate an internal complaint is not an adverse employment action." (collecting cases)); *Yampierre v. Balt. Police Dep't*, Civ. No. ELH-21-1209, 2022 WL 3577268, at *37 (D. Md. Aug. 18, 2022) ("[B]roadly speaking, the failure to investigate an internal complaint cannot be considered retaliatory because it leaves an employee no worse off than before the complaint was filed" (citation and internal quotation marks omitted).) Further, he fails to establish causation. He simply makes no argument—other than the fact that he filed complaints and they were insufficiently investigated—with respect to causation. This is insufficient, particularly at the summary judgment

26

stage.[8]

## III.   Motion to Strike

Lewis has also filed a Motion to Strike, seeking to strike various pieces of evidence from the record. (ECF No. 105.) He seeks to strike: (1) a paragraph from Shawn Matlock's Declaration; (2) two paragraphs from Kristi Baldwin's Declaration; (3) a paragraph from Jeffrey Carpenter's Declaration; (4) a video hyperlink; and (5) the Board's citation to the Court's opinion in *Downer v. Prince George's County Public Schools*.

The Court does not reference Shawn Matlock's Declaration, Jeffrey Carpenter's Declaration, or the video hyperlink above. Accordingly, the Motion to Strike will be denied as moot with respect to that evidence.

The Court will also not strike the Board's citation to *Downer*. Lewis argues that the Court may not reference a decision in that case because it is unpublished. However, although the Court does not cite to *Downer* in this Memorandum, the Court is of course free to consult any cases—published or unpublished—in rendering a decision, and the Board is free to cite any cases it feels are relevant to the Court's determination.

In her declaration, Baldwin states that Lewis's salary was not impacted by any of the corrective actions and that Lewis was never prevented from applying to or being considered for

---

[8] Lewis also references "various retaliation" and cites, without explanation, to Exhibits 1 and 27, and references an instance when he was "demeaned by" the Board and cites, also without explanation, to Exhibit 9. He also provides several tables listing various exhibits. The Court has reviewed the exhibits to which Lewis points and concludes that none change the Court's conclusion. Further, Lewis's developed arguments are confined to the five specific instances discussed above, and the Court is not required to resolve undeveloped arguments or to make arguments for the parties. *See Grandy v. City of Baltimore*, Civ. No. ELH-18-1330, 2018 WL 6726546, at *9 (D. Md. Dec. 20, 2018) ("Judges 'are not like pigs, hunting for truffles buried in the briefs,' nor is it the Court's 'job to wade through the record and make arguments for either party.'" (quoting *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 n.5 (4th Cir. 2017)).

Lewis also makes various claims that he was constructively discharged. However, it is undisputed that he remains employed by the Board, and constructive discharge claims require that a plaintiff "actually resign[]." *Jones v. UnitedHealth Grp., Inc.*, 802 F. App'x 780, 783 (4th Cir. 2020).

27

positions due to the corrective actions he received. (Board Ex. J, ECF No. 103-13.) Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

The Court will not strike this evidence. Lewis argues that these statements are conclusory and that Baldwin does not have personal knowledge of the effect of the corrective actions, and essentially simply disagrees with her statements. (ECF No. 105-1 at 2.) However, the record reflects that Baldwin is the Chief Human Resources Officer for Prince George's County Public Schools, which lays a proper foundation for considering her affidavit. Lewis's disagreement with her statements does not provide a basis for striking them.

## IV.   Conclusion

For the foregoing reasons, the Board's Motion for Summary Judgment will be granted; Lewis's Motion for Summary Judgment will be denied; and Lewis's Motion to Strike will be denied. Judgment will be entered in favor of the Board. The Clerk will be directed to close this case.

DATED this _6_ day of November, 2024.

BY THE COURT:

James K. Bredar
United States District Judge